[No. A122540. First Dist., Div. Four. Sept. 15, 2009.]

CLASSIS OF CENTRAL CALIFORNIA, Plaintiff and Respondent, v. MIRALOMA COMMUNITY CHURCH et al., Defendants and Appellants.

**COUNSEL**

Penner & Bradley & Simonian, Peter Sean Bradley, Randall M. Penner; Mayer Brown and Donald M. Falk for Defendants and Appellants.

Jones Day, Alan E. Friedman, Geoffrey P. Forgione and Orian J. Lee for Plaintiff and Respondent.

OPINION

**REARDON, J.**—This case brings to light a variation on a local church's effort to disaffiliate from a national denomination. The church's bylaws confirmed that it was subject to and governed by the constitution of the denomination, and forbade amending or modifying this provision "in any manner" absent the written consent of the entity within the denominational hierarchy that oversaw the church. Seeking to accomplish an end run around these provisions, the governing board of the local church attempted to amend its articles of incorporation and bylaws to sever its denominational ties. Applying neutral principles of law, the trial court ruled that the local church did not have the power to amend its governing documents to terminate affiliation with the national denomination, and the oversight entity was empowered to supersede the church's governing board. In light of these rulings, the court entered a permanent injunction forbidding certain actions. On appeal, appellants profess their right under state corporations law to amend the church's governing documents and control its affairs. We conclude under established California law that the disaffiliation attempt was ineffective and the oversight entity superseded the governing board. Accordingly, we affirm the judgment entering a permanent injunction.

## I. BACKGROUND

### A. *Denominational Structure*

The Reformed Church in America (RCA) is the oldest continuous evangelical Protestant denomination in this country. It is organized according to a Presbyterian polity into four governmental units, each of which exercises judicial as well as legislative powers. These units are the consistory, the classis, the regional synod and the general synod. The consistory is the governing body of a local church, comprised of the church's installed minister(s) serving under a call, and certain elders and deacons who typically are elected to specified terms by the voting members of the church. The consistory runs the day-to-day affairs of the RCA-affiliated church. The classis is an assembly and judiciary[1] comprising all the enrolled ministers within its bounds, and elder delegates representing the churches within its bounds. It is the body under whose jurisdiction every individual church affiliates with the RCA. Churches are either formally organized by a classis, or, in the case of existing unaffiliated churches, by being received under the

---

[1] Under the RCA structure, a governmental unit exercising judicial powers is a "judiciary"; at all other times it is known as an "assembly."

jurisdiction of the classis. In forming new churches, the classis must determine that the church's organizational document includes a provision substantially in the form of formulary 15 of the RCA's Book of Church Order, set forth below.[2] The various classes exercise a general superintendence over the interests and concerns of the churches within their bounds, and are empowered to enforce the governance requirements of the RCA. The classes exercise original and appellate supervisory power over the proceedings, acts and decisions of the consistories, both as to nonecclesiastical matters and those relating to Christian discipline.

Classes in turn are arranged into geographic units called regional synods, comprising ministers and elders delegated by each classis within their bounds. The synods exercise a general superintendence over the interests and concerns of the classes in their regions; exercise appellate supervisory powers over the acts, proceedings, judgments and decisions of its classes; and may form, combine and disband classes or transfer churches from one classis to another. The general synod is the highest assembly and judicatory of the RCA. We take judicial notice that under the Book of Church Order, the general synod exercises a general superintendence over the interests and concerns of the whole church as well as appellate supervisory power over the acts, proceedings and decisions of the lower assemblies. It forms the regional synods, and alone determines denominational policy.

The RCA and all its component entities and agencies, including local churches, are governed by and organized in accordance with the constitution of the RCA (RCA Constitution), which includes chapters 1 and 2 of the Book of Church Order, namely "The Government" and "The Disciplinary and Judicial Procedures."

Pursuant to the Book of Church Order, a consistory cannot sell, transfer or encumber real property without the approval of the classis of which the church is a member. The Book of Church Order also sets forth procedures by which a consistory can petition to withdraw from the RCA in order to affiliate with another denomination. Petitioners can propose that the applicant church take with it all or part of its real and personal property, free of any claim of

---

[2] Formulary 15, entitled *"Provision for Articles of Incorporation for Congregations,"* reads: "Notwithstanding anything to the contrary contained in this [insert description of organizational document], this [corporation/organization] is a member church in the Reformed Church in America; is (and at all times shall be) subject to and governed by the Constitution of the Reformed Church in America; and agrees that the provisions of this [article/chapter/paragraph] shall not be amended or modified in any manner without the prior written consent of the classis of which this [corporation/organization] is a member."

the RCA. The classis has ultimate authority to decide whether it is in its best interests to allow the church to withdraw and retain all or part of its property. Finally, whenever a church is disbanded or dissolved, all real and personal property becomes vested in the appropriate classis, if permitted by state law.

B. *Miraloma Community Church*

Appellant Miraloma Community Church (Miraloma Church or Church) was incorporated as Grace Reformed Church in 1942. It later changed its name to Miraloma Community Church.[3] In the founding articles of incorporation and as subsequently amended, the Church announced its allegiance to the RCA. Prior to March 4, 2007, the articles stated that the "specific and primary purposes [of Miraloma Church] are to operate and maintain a Reformed Church in accordance with the doctrines, laws, rules, usages and disciplines of the Reformed Church in America, as from time to time established, made, and declared by the lawful authority of said church and as set forth in its Constitution."

The bylaws of Miraloma Church provide at the outset as follows: "Notwithstanding anything to the contrary contained herein, this Miraloma Community Church is a member church in the Reformed Church in America; is and at all times shall be subject to and governed in accordance with the Constitution of the Reformed Church in America; and agrees that the provisions of this Article 1, Paragraph 2, shall not be amended or modified in any manner without the prior written consent of the Classis of which this church is a member."

Over the years, Miraloma Church conducted itself as an RCA-affiliated church in accordance with the hierarchical structure of the denomination, paying regular dues, providing annual statistical reports and submitting pastoral contracts and appointments to respondent Classis of Central California (Classis) for its consent and approval. As well, the Consistory sought and obtained permission from the Classis to sell a parsonage. And, in November 2006, the Consistory asked for permission to set aside its bylaws in order to hold over expiring members; permission was granted.

Over the years, Miraloma Church has also enjoyed the fruits of financial assistance, grants, and assistance in the pastoral search process, all as

---

[3] Appellants are Miraloma Church; Consistory of Miraloma Community Church (Consistory); and Dorothy Calvin, Michael Kaskey, Gregory Kazarian and Pat Ryan, the individual members of the Consistory.

provided by the RCA and its constituent bodies. For example, in .the early years the general synod council of the RCA made three loans totaling $46,000 to help establish Miraloma Church. The council later subordinated its liens and altered the terms of a loan to make it more favorable to the local church. Miraloma Church also received grants from an arm of the RCA for construction of a new church building. As a condition of these grants, the Church agreed that if it dissolved or sought to leave the RCA, it would return the funds. More recently, in May 2004, the general synod council approved a $15,000 matching grant to help fund a cafe ministry, vacation Bible school program and playgroup.

The Classis has also assisted the Church. In September 2003, the Classis approved a 15-year, $40,000 loan at below market interest to enable the Church to rebuild its bell tower. Additionally, since January 2002, the Classis has extended over $36,000 in various grants to Miraloma Church.

## C. Supersedure Process and Response

The Book of Church Order empowers a classis, in its judgment, to supersede a consistory and replace it with an administrative body designated by the classis. This procedure can only occur under limited, specified conditions including the "[l]ong-term or rapid decline in participation or membership" of the church in question. The Book of Church Order spells out detailed procedures for accomplishing this process.

In January 2007, and in accordance with the Book of Church Order, the Classis notified the Consistory that it was considering superseding the Consistory due to " 'long-term decline in participation and membership' which make[s] it unable to fulfill the functions of a local church . . . ." Between 1991 and 2006, the number of communicant or confessing members declined from 84 to 20, five fewer than the minimum for a quorum for general membership meetings as stated in the Church's bylaws. Average attendance dropped from 102 in 1997, to 48 in 2006.

A Classis team convened in February 2007 to give the Consistory an opportunity to show cause why it should not be superseded. Following the Consistory's presentation, and on the motion of the Classis team, the Classis voted on March 10, 2007, to supersede the Consistory and appoint interim trustees to serve as the interim board of directors. However, the members of the Consistory refused to relinquish power as required under the Book of Church Order.

Instead, they attempted to leave the denomination. After receiving notice from the Classis of its intent to supersede the Consistory, the Consistory members withdrew $437,391.64 "from its RCA account" and transferred that balance to another account. Further, thereafter the Consistory endeavored to terminate Miraloma Church's affiliation with the Classis and the RCA. Ballots were distributed to each confessing member, which purported to amend the articles of incorporation and bylaws by deleting any reference to the RCA and its governing rules. At its special meeting of March 4, 2007, the Consistory counted the ballots and approved the actions of the members purporting to amend the organizational documents.

The Classis initiated litigation; in April 2007, the trial court issued a temporary restraining order and preliminary injunction maintaining the status quo but allowing Miraloma Church to use its funds to pay counsel. The interim relief prevented the congregation from alienating property or taking further steps to disaffiliate from the RCA. Fourteen months later, the court granted summary adjudication on the declaratory relief cause of action as well as the cause of action seeking a permanent injunction, and issued permanent injunctive relief.

Ruling on the declaratory relief count, the court determined that Miraloma Church is a subordinate member church in the RCA hierarchy, bound by the RCA's rules, canons and constitution. Moreover, the purported amendments to the articles of incorporation and bylaws were ineffective and invalid because Miraloma Church lacked the power to take such actions to terminate the Church's affiliation with the RCA without the prior written consent of the Classis. As well, the Classis was entitled to and did supersede the consistory and as a result had the exclusive right to control and direct the affairs and property of the Church through the directors duly appointed by the Classis. The permanent injunction in turn restrained the Consistory and its individual members from taking any steps to (1) prevent or interfere with the Classis's custody, possession and control of Church property or with its exercise of corporate control functions; (2) exercise dominion or control over the affairs or property of the Church; or (3) sell, transfer or otherwise alienate any real property or transfer, spend, or lend any money or personal property of Miraloma Church.

Meanwhile, the trustees terminated the engagement of the law firm of Penner, Bradley & Simonian and moved to disqualify the firm from representing Miraloma Church while jointly representing the members of the

Consistory. Apparently the trial court granted the motion in November 2008. This appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

Both parties agree that this appeal frames an issue of who has the right to control Miraloma Church, not who owns the church property. Appellants correctly urge that we should decide the matter using neutral principles of law. As we explain, our standard of review will be de novo.

The trial court granted summary adjudication of the seventh cause of action for a permanent injunction "for the reasons" set forth in support of its decision to grant summary adjudication of the first cause of action for declaratory relief, and further found that the Classis would be irreparably harmed unless the injunction issued. In issuing the permanent injunction, the trial court incorporated by reference its order on the motion for summary adjudication as to these two causes of action.

As a general matter, the grant or denial of a permanent injunction rests within the trial court's sound discretion, which we do not disturb on appeal absent a showing of clear abuse. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390 [33 Cal.Rptr.3d 644].) Here, however, the heart of this appeal is the trial court's incorporated decision on the declaratory relief cause of action which it decided as a matter of law. As our review is of the trial court's decision on the matters of church hierarchy, Miraloma Church's attempt to amend its corporate documents and the Classis's invocation of the supersedure procedure depends on judicial interpretation of the articles of incorporation, bylaws, and other governing documents of the RCA and Miraloma Church, as well as the relevant statutes and the undisputed factual circumstances of the case, we apply neutral principles of law de novo. (*Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1408, 1412–1413 [34 Cal.Rptr.3d 412] (*Concord Christian*); see *New v. Kroeger* (2008) 167 Cal.App.4th 800, 814 [84 Cal.Rptr.3d 464] (*New*).)

### B. *Guiding Principles*

Although this appeal does not involve issues of title to or ownership of property, the same rationale for applying neutral principles of civil law

should apply to nonecclesiastical issues of organizational governance. (*Concord Christian, supra*, 132 Cal.App.4th at pp. 1412–1413.) The high court in *Jones v. Wolf* (1979) 443 U.S. 595, 602 [61 L.Ed.2d 775, 99 S.Ct. 3020] has made it clear that state civil courts have general authority to resolve church property disputes, and states have a legitimate interest in so resolving such disputes. However, the First Amendment—and its California counterpart (Cal. Const., art. I, § 4)—prohibit state civil courts from resolving these matters on the basis of religious doctrine and practice. Moreover, the First Amendment demands that civil courts defer to resolution of the issues of religious doctrine or polity by the highest adjudicatory arm of a hierarchical church organization. (*Jones v. Wolf, supra*, 443 U.S. at pp. 602–603.) The term "polity" refers " ' "to the general governmental structure of a church, the organs of authority and the allocation and locus of its judicatory powers as defined by its own organic law." [Citations.]' [Citation.]" (*New, supra*, 167 Cal.App.4th at p. 815.)

■ As explained in *New*, deference to ecclesiastical matters is greatest in the hierarchical churches. (*New, supra*, 167 Cal.App.4th at p. 815.) A hierarchical church has been defined as one "in which individual churches are 'organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head' vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church. [Citations.] It has long been established that in such a hierarchical church, an individual local congregation that affiliates with the national church body becomes 'a member of a much larger and more important religious organization, . . . under its government and control, and . . . bound by its orders and judgments.' [Citations.] In contrast, a congregational church is defined as one 'strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned, owes no fealty or obligation to any higher authority.' [Citation.]" (*Concord Christian, supra*, 132 Cal.App.4th at p. 1409; accord, *New, supra*, 167 Cal.App.4th at pp. 815–816.)

■ As to nonecclesiastical matters such as intrachurch property disputes, the court in *Jones v. Wolf, supra*, 443 U.S. 595 specifically approved the "neutral principles of law" approach to resolving these issues, as follows: " '[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.' " (*Id.* at p. 599.) Our own Supreme Court recently took a position on this matter, first clarifying that in resolving church property disputes, secular courts must not become entangled in doctrinal quarrels or infringe on the free exercise of religion. (*Episcopal Church Cases* (2009) 45

Cal.4th 467, 478 [87 Cal.Rptr.3d 275, 198 P.3d 66].) However, "[s]ubject to the proviso that secular courts may not decide questions of church doctrine, we believe that California courts should use neutral principles of law to decide church property disputes." (*Id.* at p. 485.) Accordingly, courts should proceed in this manner: If the dispute turns on a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the matter. To the extent the court can resolve the dispute without referring to church doctrine, "it should apply neutral principles of law. The court should consider sources such as . . . the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes . . . ." (*Ibid.*) As our state's high court also explained in the context of a local church that has always agreed to be part of a larger denominational body and to be bound by that body's governing instruments, "[r]espect for the First Amendment free exercise rights of persons to enter into a religious association of their choice . . . requires civil courts to give effect to the provisions and agreements of that religious association." (*Id.* at p. 489.)

C. *Miraloma Church Was a Subordinate Church Within a Hierarchical Denomination*

The trial court correctly decided as an initial matter that Miraloma Church was a subordinate member of the RCA hierarchy, and was therefore bound to the RCA rules, canons and constitution. The RCA Constitution establishes a four-tiered, interconnected administrative structure with superior judicatories exercising a general superintendence over subordinate judicatories within their bounds. Local churches, such as Miraloma Church, are members of the larger, more powerful denominational organization and subject to the RCA Constitution. Each affiliated local church is to conduct its business in accord with the governance provisions of the Book of Church Order. Significantly, the Book of Church Order requires that the organizational document of a member church announce the church's allegiance to the RCA Constitution, to the effect that the church "is a member church" in the RCA, and is "subject to and governed by" the RCA Constitution.

As well, the corporate documents of Miraloma Church declare its faithfulness and subordination to the RCA Constitution. The articles of incorporation state that the primary purpose of the organization is to operate a Reformed church "in accordance with the doctrines, laws, rules, usages and disciplines" of the RCA as set forth in its constitution. The bylaws in turn provide that the main purpose of the Consistory is to govern the affairs of the congregation

"in accordance with" the RCA Constitution. Moreover, the bylaws incorporate the language of formulary 15 to the effect that Miraloma Church is a member church of the RCA, subject to and governed by its constitution, and notwithstanding anything to the contrary, such provision shall not be amended or modified "in any manner" without the prior written consent of the Classis.

Finally, Miraloma Church has acted consistently and in conformity with the hierarchical nature of the RCA polity and recognized the ecclesiastical authority and superintendence embedded in that polity. As examples, Miraloma Church sought the Classis's approval to sell real property, to extend the terms of service of members of the Consistory, and to hire and retain pastors. The Consistory routinely submitted annual statistical reports to the Classis and paid regular dues. The Consistory even initially acted in a manner consistent with the Book of Church Order dictates for the supersedure process.

In sum, the uncontroverted record indicates that from its inception and throughout its history, Miraloma Church has been a subordinate member of the hierarchical RCA denomination and has accepted and submitted itself to the authority of the RCA Constitution.

Appellants argue nonetheless that the RCA is not a hierarchical church. According to appellants, the Presbyterian structure, which the RCA follows, is representative in form, with authority being exercised by laypersons and clergy in a representative capacity. Thus they argue that the Presbyterian structure lies in between the congregational and episcopal (hierarchical) structures, and caution that we should not "reach a result" that is not reflective of the true nature of the RCA. While it is true that in the RCA structure laypersons and clergy exercise authority in a representative capacity at the various governance levels within the denomination, the structure nonetheless follows a tiered model of superintendence and appellate supervisory powers, from the local consistory up to the general synod. It is this tiered structure, with each ascending tier exercising superintendence and appellant supervisory power over the acts, proceedings, judgments and decisions of the lower tier, that brings it within the general category of a hierarchical as opposed to a congregational church organization.

D. *Appellants' Attempt to Disaffiliate Was Ineffective*

The trial court interpreted the formulary 15 language tracked in the bylaws of Miraloma Church as follows: "The bylaws as they existed expressly

prevented the . . . Church . . . from changing its bylaws in any manner to avoid the requirement of plaintiffs' consent to a change." This provision broadly included "controlling how the Articles of Incorporation can be changed where [they] are changed in order to change the bylaws, in order to eliminate the requirement of consent." The court went on: "In other words, even if it's the case, as it generally is, that the Articles of Incorporation will control the bylaws, that doesn't mean that the bylaws aren't relevant in when and how and whether the articles can be amended." Thus the court concluded that "the only reasonable reading" of the formulary 15 provision is that the Church cannot "get out from under the requirement of consent" "by changing the articles or by changing the bylaws."

The key to this interpretation, of course, is the language proscribing amendment or modification *"in any manner"* (italics added) without the Classis's prior written consent, such that amending the articles ultimately to eliminate the consent provision of the bylaws comes within this prohibition.

Appellants maintain that the Consistory was free to amend the articles to eliminate any reference to the RCA Constitution, rules and regulations, without the consent of the Classis, because nothing in the articles required such consent; therefore, termination of affiliation with the RCA by amending the articles and bylaws was proper and effective. They recite the principle of corporate law that articles of incorporation control over conflicting provisions in a corporation's bylaws, and thus the amended articles disaffiliating Miraloma Church from the RCA rendered the conflicting formulary 15 language in the bylaws void.

█ We do not disagree that, as a general matter, articles take precedence over bylaws. (*Olincy v. Merle Norman Cosmetics, Inc.* (1962) 200 Cal.App.2d 260, 266–267 [19 Cal.Rptr. 387].) However, in deciding the issue at hand under neutral principles of law, we are not restrained to look only to California corporations law. █ Rather, in construing the corporate documents we may also refer to the national church's constitution, canons and the like. (*Jones v. Wolf, supra*, 443 U.S. at pp. 602–604; *New, supra*, 167 Cal.App.4th at p. 820.) As recently reiterated in *New*: "[R]eligious corporations are merely 'permitted as a convenience to assist in the conduct of the temporalities of the church. Notwithstanding incorporation the ecclesiastical body is still all important. The corporation is a subordinate factor in the life and purposes of the church proper.' " (*New*, at p. 820, quoting *Wheelock v. First Presb. Church* (1897) 119 Cal. 477, 483 [51 P. 841].)

*New* is helpful. There, board members of a parish church resigned from the national church, affiliated with another church, and amended the articles of incorporation and bylaws to eliminate the language of accession to the constitution and canons of the Episcopal Church and the diocese. A bishop determined the resigned members were no longer qualified to serve on the parish's governing board and a new board was elected, but the resigned members refused to relinquish their seats or control over church assets. The trial court concluded that the resigned members were the lawful directors of the parish corporation. Applying neutral principles of law, the reviewing court reversed, concluding among other things that under church canons, the defendants ceased being directors of the parish corporation because they were not members in good standing in the Episcopal Church. When the defendants resigned from the Episcopal Church, they were no longer empowered to act, and their actions in attempting to amend the bylaws and articles were a nullity. The court reached this conclusion looking not only to state corporations law, but also to the governing documents of the religious corporation and the national church's constitution and canons. (*New, supra,* 167 Cal.App.4th at pp. 820–823.)

Similarly, in *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919 [13 Cal.Rptr.3d 552] (*Guardian Angel*), the election of the board of directors of the local parish was not approved by the bishop. The unapproved board voted to sever all ties with the national church and amended the articles of incorporation to change the corporation's name and to repeal portions of the bylaws that governed liquidation of a parish. The reviewing court held that since the articles of incorporation of the parish recognized the authority of the national church, that body's constitution, rules and regulations comprised part of the parish's bylaws. (*Id.* at p. 925.) All acts of the purported board were unauthorized because the constitution of the national church required diocesan approval of the board of directors' election. (*Id.* at p. 927.)

So, too, in *Concord Christian*, the local church's attempt to withdraw its denominational affiliation was in vain. Under neutral principles of law, the local church's failure to give notice to the denomination or regional board rendered its withdrawal vote ineffective under the denomination's national bylaws as well as the local church's bylaws. (*Concord Christian, supra,* 132 Cal.App.4th at pp. 1414–1415.) Further, the denomination properly imposed regional supervision over the local church in accordance with its national bylaws. (*Id.* at pp. 1415–1416.)

The facts here are not 100 percent on point with the above cases, but all are instructive. Here, members of the Consistory purported to amend the articles of incorporation and bylaws without resigning as was the case in *New, supra,* 167 Cal.App.4th 800. As well, there was no issue that the Consistory was not the approved board of directors when it tried to amend the governing documents, as was the case in *Guardian Angel, supra,* 118 Cal.App.4th 919. And, while the Classis has argued that the attempted disaffiliation violated the notice and quorum requirement of Miraloma Church's bylaws, the trial court made no ruling on these points and we need not resolve them in this appeal.

However, there are important similarities. Significantly, the articles of incorporation of Miraloma Church pledge fealty to the RCA, articulating that the Church's specific and primary purpose is to maintain a church "in accordance with the doctrines, laws, rules, usages and disciplines of the [RCA], as from time to time established, made, and declared by the lawful authority of said church and as set forth in its constitution." The bylaws state unequivocally that Miraloma Church is a member of the RCA, at all times subject to and governed by its constitution, and agrees that this overriding provision cannot be amended or modified in any manner without the prior written consent of the Classis. With these provisions, the governance of Miraloma Church is tied directly to the RCA Constitution and its Book of Church Order, setting forth the form of government for the Church. (See Corp. Code,[4] § 9150, subd. (a) [bylaws of nonprofit religious corporation mean "the code or codes of rules used, adopted, or recognized for the regulation or management of the affairs of the corporation *irrespective of the name or names by which such rules are designated*" (italics added)]; *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 503–504 [281 Cal.Rptr. 396], disapproved on another point in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

■ By the time the Consistory acted to amend the articles and bylaws of Miraloma Church, the following actions to accomplish the supersedure had already occurred: The Classis had instituted the procedure as outlined in the Book of Church Order; a Classis team had convened to permit the Consistory to show cause why it should not be superseded; and thereafter the team moved that the Consistory be superseded and that a motion be brought to a vote at the March 10, 2007 stated session of the Classis. These actions were in accordance with the Book of Church Order, part of the RCA Constitution recognized in the Church's organizing documents. All this is to say that in light of the Church's commitment to the RCA Constitution as reflected in its articles and bylaws, as well as its actions over the years, the trial court

---

[4] All further statutory references are to the Corporations Code.

correctly ruled that the Consistory could not excise the formulary 15 language from the bylaws by attempting to amend the articles of incorporation and then the bylaws to remove all references to, and disaffiliate from, the RCA.

Appellants have consistently trumpeted *California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church* (2004) 121 Cal.App.4th 754 [17 Cal.Rptr.3d 442] (*St. Luke's*) as controlling the governance issues framed in the present case. The *St. Luke's* opinion has been appropriately discredited.

Resolving a property dispute between a local church and the national denomination, the *St. Luke's* court held as a general principle that the local church could revoke a trust created for the benefit of the national denomination and pursuant to the local church's agreement to a national rule providing for local churches to hold property in trust for the denomination. (*St. Luke's, supra*, 121 Cal.App.4th at p. 757.) The articles of incorporation of the local church and trust language in the deeds demonstrated an intent to be bound by the denomination's rules, which called for holding the property in trust for the local and national church. (*Id.* at pp. 770–771.) Despite this reality, the *St. Luke's* court held that pursuant to section 9142, the local church could amend its articles of incorporation to state it would not be affiliated with the denomination or subject to its discipline and would hold the property in trust for the sole benefit of the corporation. This holding has been criticized. Like appellants in this case, the defendants in *New* relied on *St. Luke's* for the proposition that courts should look only to the Corporations Code and not to any rules of the national church with which the local church is affiliated. Rejecting that proposition, the court concluded that the statement in *St. Luke's* "to this effect is contrary to the overwhelming weight of authority . . . , including the United States Supreme Court's decision in *Jones* [*v. Wolf*], *supra*, 443 U.S. 595. In fact, the Court of Appeal itself noted that its holding was 'at odds' with other California authority." (*New, supra*, 167 Cal.App.4th at pp. 823–824.)

■ In a related matter, the court in *St. Luke's* also determined that section 9142 does not permit a national denomination to create a trust interest in property owned by a local church just by issuing a rule declaring that such a trust exists. (*St. Luke's, supra*, 121 Cal.App.4th at p. 757.) Our Supreme Court took issue with this decision: "As a general proposition, this statement is inconsistent with [the plain language of the statute], and we disapprove it. Instead, we agree with the assessment of the Court of Appeal in this case: '[I]n a hierarchically organized church, the "general church" can impress a trust on a local religious corporation of which the local corporation is a

"member" if the governing instruments of that superior religious body so provide.' " (*Episcopal Church Cases, supra*, 45 Cal.4th at pp. 491–492, italics omitted.)

■ Appellants further suggest that the courts in cases such as *Concord Christian* and *New* are not applying neutral principles but instead are serving as enforcers of the will of denominational religious hierarchies. Not so. The proper approach, which the above courts and this court are following, is the one announced in *Episcopal Church Cases*: We do not decide questions of religious doctrine, but rather resolve property and governance disputes by applying neutral principles of law, considering, where relevant, sources such as deeds, the local church's articles of incorporation and bylaws, the general church's constitution and rules, and relevant statutes. (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 473.)

E.  *Classis Was Entitled to Supersede the Consistory*

The trial court correctly determined that the RCA was a hierarchical church. Therefore, the Classis's decision to institute the supersedure process, and its vote to supersede, were precisely the kind of ecclesiastical judgments to which we defer. (See *Concord Christian, supra*, 132 Cal.App.4th at p. 1413.) Moreover, procedurally the Classis followed the dictates of the Book of Church Order: It invoked a proper condition authorizing supersedure, namely long-term or rapid decline in membership or participation; afforded Miraloma Church an opportunity to show cause why its Consistory should not be disbanded; submitted the supersedure question to the full Classis for a vote; and appointed interim trustees. Although the Book of Church Order affords an aggrieved party the right to appeal an ecclesiastical judgment of the Classis, appellants chose not to do so.

■ Appellants are nonetheless certain that supersedure violates the Corporations Code. They claim that the procedure is "illegal and void" under section 9210[5] because it impermissibly delegates the function of the board of directors to the trustees, referring to *Communist Party v. 552 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 995 [41 Cal.Rptr.2d 618]. In that case the Communist Party contended that certain corporations were its alter egos because of a purported secret agreement between the party and the corporations' directors whereby the directors would do " 'exactly what the Party told

---

[5] Section 9210 dictates that a corporation shall have a board of directors, and the corporation's activities and affairs "shall be conducted and all corporate powers shall be exercised by or under the direction of the board." (*Id.*, subd. (a).) Further, the board of directors may delegate the management of corporate activities and affairs to another, provided such activities and affairs shall be managed, and all powers exercised, under the board's ultimate direction. (*Id.*, subd. (b).)

them . . . without independently exercising their judgment.' " (*Id.* at p. 994.) Here there was no secret agreement on the part of the trustees to manage the affairs of the Church. Rather, the trustees assumed the role of the board of directors. Additionally, section 9220, subdivision (a) states that the articles or bylaws may provide for "the tenure, election, selection, designation, removal, and resignation of directors." Thus, with the acknowledgment in the bylaws that Miraloma Church is subject to and governed by the RCA Constitution, section 9220 would permit the Classis to appoint trustees as interim directors pursuant to the supersedure process.

Appellants also argue that section 9210 requires that a corporation have a board of directors at all times. We are unaware of any authority that says there can never be a lapse on the board of directors. On the other hand, the Book of Church Order does not require a church whose consistory has been superseded to operate without a board of directors. Rather, the Classis is empowered to replace the individual consistory members with trustees who would exercise the board functions.

■ As well, appellants see supersedure as running afoul of section 9680, which sets forth the procedures for dissolving a corporation. But supersedure does not address the formalities of corporate dissolution. Appellants further assert that section 9142 requires that before any ownership interest can be vested in the Classis, that interest must be documented in writing. There is no affront to section 9142 here. That statute concerns the impressing of a trust in church property. It does not address control or administration of the church, the focus of the supersedure procedure.

F. *Standing*

■ Section 9141, subdivision (a) generally provides that an action cannot be brought to limit "the activities, purposes, or powers of the corporation or upon the powers of the members, officers, or directors, or the manner of exercise of such powers, contained in or implied by the articles" unless the plaintiff is one of several designated persons, including "any person authorized by the articles or bylaws to bring an action . . . ." Appellants urge that under this statute, the Classis has no standing to challenge the corporate actions that appellants took.

At the time of instituting legal action against the former Consistory and its members, the Classis had superseded the Consistory and appointed trustees to serve as the interim board of directors. While the Church itself was named as a defendant, the real target of the injunctive relief was the former Consistory and its members who refused to give up power. Since the Classis properly instituted and concluded the supersedure action, the lawsuit was not an

assault on the activities, purposes and powers of the corporation or its officers or directors, but rather upon the defunct Consistory and its members. Section 9141 would not apply.

■ In any event, the bylaws and articles together subordinate Miraloma Church to the RCA hierarchical authority, and condition disaffiliation on the prior written consent of the Classis. The Corporations Code permits a religious corporation to include in its articles of incorporation "[a] provision that requires an amendment to the articles or to the bylaws, and any amendment or repeal of that amendment, to be approved in writing by a specified person or persons other than the board or the members." (§ 9132, subd. (c)(4).) In a similar vein, section 9150, subdivision (b) states that "[t]he articles or bylaws may restrict or eliminate the power of the board to adopt, amend or repeal any or all bylaws . . . ." A provision such as formulary 15 requiring third party consent is thus an authorized restriction within section 9150, subdivision (b). We do not read section 9141 as forbidding a right of third parties to enforce their legally conferred power of consent. In other words, an action to enforce such consent provisions is not an unauthorized third party action to *limit* the powers of the corporation or the powers of its members, officers or directors. If section 9141 were a bar to proceedings to enforce a consent clause, sections 9132, subdivision (c)(4) and 9150, subdivision (b) would be meaningless. The designated third party would have no remedy where, as here, the board of directors amended the articles or bylaws without the required approval.

· *Korean Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069 [92 Cal.Rptr.2d 275], cited by appellants, is inapposite. There, a local church attempted to disaffiliate from the national church. The presbytery purported to fire the pastor who headed the disaffiliation effort. Citing section 208,[6] the reviewing court held that the presbytery was a corporate outsider lacking standing to challenge the bid for control spearheaded by the faction aligned with the fired pastor. The presbytery was not a member of the local church or entitled to vote for its officers or directors. (*Korean Philadelphia, supra,* at pp. 1082–1083.) Unlike in the present case, the local church bylaws in *Korean Philadelphia* did not confer on a superior denominational entity the power of consent to any corporate action, nor did the articles of incorporation reference the national church's constitution or promise to be subject to its terms for the purpose of corporate governance. (*Id.* at pp. 1074, 1088.)

---

[6] Section 208 does not contain the operative language of section 9141, subdivision (a), which grants standing to a "person authorized by the articles or bylaws to bring an action . . . ."

## III. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.

Appellants' petitions for review by the Supreme Court were denied December 2, 2009, S177276.