Filed 7/23/14  The Rector, etc. of St. Mary of the Angel's Parish et al. v. Anglican Church CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE RECTOR, WARDENS AND VESTRYMEN OF ST. MARY OF THE ANGELS' PARISH IN HOLLYWOOD, LOS ANGELES, CALIFORNIA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ANGLICAN CHURCH IN AMERICA et al., <br><br> Defendants and Respondents. | B248112, B248929, B248931 <br><br> (Los Angeles County  Super. Ct. Nos. BC487079,  BV030277, 12U07875,  BV030278, 12U10148) |

APPEAL from judgments of the Superior Court for Los Angeles County, Michael P. Linfield, Judge.  Reversed and remanded.

TroyGould, Alan M. Dettelbach, Arvin Tseng and Russell I. Glazer for Plaintiffs and Appellants.

Lancaster & Anastasia, Damon C. Anastasia and William H. Lancaster for Defendants and Respondents.

The Rector, Wardens, and Vestrymen of St. Mary of the Angels' Parish in Hollywood, Los Angeles, California (St. Mary's or the Parish) is a California nonprofit religious corporation that owns property in Hollywood, including a church and a commercial building. A dispute arose among the members of the Parish. A majority of the members (including the Rector/Priest-in-Charge and a majority of the elected Board of Directors, also known as the Vestry) wanted the Parish, which at the time was affiliated with the Anglican Church in America (the ACA), to pursue reunification with the Roman Catholic Church. Other members wanted the Parish to remain with the ACA. At one point during the dispute, the ACA took disciplinary action against the Rector, Father Christopher P. Kelley, inhibiting him from performing any ecclesiastical duties, and ordering him to vacate the premises owned by St. Mary's. The ACA appointed a new Rector, who then removed several members of the elected Vestry and appointed new members.

When Father Kelley refused to vacate the premises, the ACA (and other related parties, including the appointed Vestry) filed a lawsuit against him and sought a temporary restraining order and preliminary injunction. Eventually, three more lawsuits were filed; two were brought by the elected Vestry against the ACA and/or members of the appointed Vestry, and one was brought by the appointed Vestry against Father Kelley and his family. All of the lawsuits required resolution of one dispositive question: Who controls St. Mary's?

The ACA-related parties argued that the answer to this question requires resolution of ecclesiastical matters, and that the civil courts must defer to the authoritative ecclesiastical body of the Church. The trial court agreed, and dismissed the cases brought by the elected Vestry and granted summary judgment to the appointed Vestry in its action against Father Kelley and his family. On appeal, the elected Vestry contends that the dispositive question can be answered under neutral principles of law, without deciding any questions of religious

2

doctrine. We conclude that the determination of who controls St. Mary's depends upon the validity of an August 2012 vote by members of the Parish to disaffiliate from the ACA, and that the validity of that amendment can be determined by applying neutral principles of law. Accordingly, we reverse the judgments in the three cases before us and remand for further proceedings.

## BACKGROUND

A.      *History of St. Mary's*

Founded in 1918 by Father Neal Dodd, St. Mary's was established to minister to people working in the motion picture industry. It incorporated as a Religious Corporation under California law in 1930. Its articles of incorporation at that time stated that the corporation was formed "[t]o establish and maintain a Parish, which shall form a constituent part of the Diocese of Los Angeles in that branch of the Holy Catholic Church now known as the Protestant Episcopal Church in the United States of America." That same year, the Parish built a church building using funds raised from its parishioners; title to the property was held in the name of the Parish.

In January 1977, the Parish amended the articles of incorporation to remove the reference to the Protestant Episcopal Church and instead state that the purpose of the corporation is "[t]o establish and maintain a Parish, which shall form a constituent part of the One, Holy, Catholic and Apostolic Church as that Church has been known in the Anglican Catholic tradition."[1] After St. Mary's notified the Protestant Episcopal Church that it was withdrawing from the Episcopal Church,

---

[1]      The articles of incorporation were amended again in 1978 to add a provision irrevocably dedicating the corporation's property to "religious, charitable, scientific or hospital purposes." That was the last amendment before the dispute arose in the present cases.

3

the Church sued St. Mary's over ownership of the parish's property. In a published decision, *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, the appellate court held that St. Mary's was allowed to amend its articles of incorporation and withdraw from the Episcopal Church, and that the Parish's property belonged to St. Mary's. (*Id.* at pp. 621-625.)

From 1977 to 1984, St. Mary's was a member of a denominational association that was a temporary jurisdiction for former Episcopal parishes that wanted to join the Roman Catholic Church. The Roman Catholic Church, however, refused to admit St. Mary's. In 1984, the Parish joined the Anglican Catholic Church (ACC), which had been formed in 1978 by other former Episcopal parishes in the United States.

St. Mary's left the ACC in 1992 to join the ACA, which was a new denomination that St. Mary's and other disaffected ACC parishes helped to form. The ACC sued St. Mary's, claiming that the Parish was prohibited from leaving the denomination, but St. Mary's again prevailed in court. Although St. Mary's did not amend its articles of incorporation when it joined the ACA, it did amend its by-laws to state that "[t]he Parish is affiliated with the Anglican Church in America (A.C.A.) and its Diocese of the West."[2]

B.    *Structure of the ACA*

The ACA is a hierarchical church. It consists of a General Synod, made up of the House of Bishops, the House of Clergy, and House of Laity. It is divided

---

[2]    We quote from the by-laws as revised in 2008. The elected Vestry contends the by-laws were amended in January 2011 to state that "[t]he Parish is affiliated with the Anglican Church in America (A.C.A.) and its Patrimony of the Primate." The trial court questioned the validity of this amendment, but determined it need not decide that issue. Like the trial court, we also do not need to decide whether the amendment was valid.

4

into four geographical regions, or dioceses; St. Mary's is located in the region governed by the Diocese of the West (DOW). The ACA is governed by its Constitution and Canons, and each diocese has its own written canons.

The ecclesiastical head of each diocese is the "Bishop Ordinary" or "Episcopal Visitor," who is the president of the diocesan corporation and the chief pastor of all members of the Church in the diocese. He is responsible for ensuring that provision is made for the due celebration of Sundays at all parishes within the diocese, and all priests within the diocese serve as the extension of his ministry. At the time of the events at issue in these lawsuits, The Rt. Rev. Bishop Stephen D. Strawn was the Bishop Ordinary of the Diocese of the Missouri Valley and the Episcopal Visitor to the DOW, as well as the Vice President of the House of Bishops.

C.    *Events Leading to the Present Dispute*

In November 2009, Pope Benedict XVI issued the Apostolic Constitution, which allowed Anglican parishes to join the Roman Catholic Church. The Roman Catholic Church created "Ordinariates" -- entities similar to dioceses -- into which Anglican parishes would transfer. To facilitate the transition, the ACA adopted the "Patrimony of the Primate" -- a kind of "holding tank" for parishes that contemplated transferring to the Roman Catholic Church.

St. Mary's transferred from its diocese, the DOW, to the Patrimony of the Primate in December 2010 or January 2011. In May 2011, the Parish conducted a formal vote to determine whether to join the Ordinariate. An overwhelming majority -- 81 percent -- voted in favor of moving. Another vote was conducted on January 22, 2012, and 83 percent voted to complete the process.

In the meantime, on December 10, 2011, five members of the Vestry (a majority of the nine-member Vestry) signed a letter to the Rector of St. Mary's,

5

Father Kelley, asking him to resign as Rector. The members informed Father Kelley that they had spoken to the Bishop[3] about their concerns regarding his conduct as Rector, and that the Bishop instructed them to formally ask for his resignation. Father Kelley did not resign.

At the Annual Meeting of the Parish held on February 5, 2012, nominations and elections to the Vestry were held. Following the election, the members of the Vestry were announced: Steve Hawkins, Armine Jones, and John Pouncey (with three years remaining on their terms); Allan Trimpi, Linda Bruce, and Aloyce Levin (with two years remaining); and Jackie Yeager, Marilyn Bush, and Gina Park (with one year remaining).[4] The newly-elected Vestry did not include any of the members who signed the December 10, 2011 letter.

Bishop Strawn, who had just been appointed Episcopal Visitor to the DOW and learned of allegations that had been made against Father Kelley by some of the members of St. Mary's, conducted a review of the charges. On April 2, 2012, Bishop Strawn took disciplinary action against Father Kelley by issuing a "Notice [o]f Inhibition," which "inhibited [Father Kelley] from preaching the Word of God, from administering the holy Sacraments, and from reading the Common Prayers in public worship and from performing all other ecclesiastical duties and administrations pertaining to the office of a Priest or Deacon in any form or fashion." The notice also ordered Father Kelley to vacate the premises owned by

---

[3] At the time of the letter, St. Mary's had transferred to the Patrimony of the Primate, and Bishop David Moyer was the oversight bishop of the Patrimony. The Patrimony was dissolved on January 1, 2012, and St. Mary's was automatically returned to the ecclesiastical authority of the DOW. Bishop Strawn was given an interim appointment as Episcopal Visitor of the DOW in January 2012, and was appointed by the House of Bishops in March 2012.

[4] Linda Bruce resigned her position on the Vestry a few weeks later, and the Vestry kept her position vacant.

St. Mary's and not to contact members of St. Mary's. Father Kelley refused to recognize the Inhibition and refused to abide by its orders.

Bishop Strawn appointed The Rev. Canon Anthony J. Morello as Rector and Priest-in-Charge of St. Mary's. Canon Morello appointed Vestry member Marilyn Bush as Senior Warden[5] of the Vestry on April 9, 2012, removing Allan Trimpi from that position.

D.   *The Lawsuits Begin*

On May 25, 2012, the ACA, the DOW, and "The Rector, Wardens, and Vestrymen of St. Mary of the Angels' Parish"[6] filed a lawsuit (Los Angeles Superior Court case No. BC485402, hereafter, the initial action) against Father Kelley alleging causes of action for ejectment, conversion, violation of Corporations Code section 9110/tortious interference with corporate business, preliminary and permanent injunctions, unfair and deceptive business practices, and accounting and disgorgement of benefits.[7] On that date, the court (Judge Ann I. Jones, presiding) issued an order to show cause re preliminary injunction (set for hearing on June 13), and a temporary restraining order enjoining Father Kelley from, among other things, exercising any ecclesiastical or administrative control over St. Mary's, or physically remaining on or returning to any premises owned by

---

[5]   The Senior Warden of the Vestry is the Executive Vice President of the corporation.

[6]   As noted, the dispositive issue in these cases is who controls St. Mary's, i.e., who constitutes "The Rector, Wardens, and Vestrymen of St. Mary of the Angels' Parish." For clarity, we refer to the Vestry that was elected on February 5, 2012 as the elected Vestry, and the Vestry that includes members appointed by Canon Morello as the appointed Vestry.

[7]   This case is not before us in this appeal, but rulings made in the case, and the fallout from those rulings, are relevant to the cases that are before us.

St. Mary's (other than the cottage in which he and his family were living). That same day, Marilyn Bush and others took over physical possession of the St. Mary's premises, changed all of the locks on the exterior and interior doors, seized possession of all of St. Mary's personal and real property, and ordered all St. Mary's personnel to leave the premises.

In opposing the ACA-related parties' request for a preliminary injunction, Father Kelley argued that Bishop Strawn, as Episcopal Visitor to the DOW, did not have jurisdiction to discipline him because St. Mary's was under the jurisdiction of the Patrimony of the Primate. The ACA argued that the Patrimony had dissolved on January 1, 2012, at which time any parish that had not been accepted into the Roman Catholic Church's Ordinariate automatically returned to the jurisdiction of its regional diocese (in St. Mary's case, the DOW). Father Kelley asserted, however, that the ACA did not follow its rules in dissolving the Patrimony and/or that the parishes remaining in the Patrimony did not return to their regional diocese unless they affirmatively chose to do so.

At the hearing on the order to show cause re preliminary injunction the trial court observed that to determine whether the ACA-related parties were likely to prevail on their claims of ejectment, conversion, tortious interference and other allegations of jurisdictional impropriety (the court found there was no competent evidence to support the claims that Father Kelley misappropriated church monies or otherwise engaged in improper financial behavior) it was necessary to determine whether the Patrimony was properly dissolved (and therefore whether St. Mary's was returned to the jurisdiction of the DOW). The court concluded, however, that it was not constitutionally permitted to resolve the issue of whether the Patrimony was properly dissolved because it was a religious dispute. Therefore, the court dissolved the temporary restraining order and denied the preliminary injunction.

8

After the trial court issued its ruling, Allan Trimpi (a member of the elected Vestry) went to the St. Mary's premises and was confronted by Marilyn Bush, Keith Kang, and Diane Kang, who refused to vacate or give him access to the premises. Trimpi contacted Father Kelley's attorney, who filed an ex parte application the next day seeking clarification from the court regarding the right of Bush and the others to retain possession of the premises. The court issued a minute order stating, in part, "To the extent that the plaintiffs have seized property and/or dispossessed Father Kelley of his position as the rector of St. Mary's of the Angels Church or otherwise enjoined him from access to the Church pursuant to the court's previously issued temporary restraining order, that order has dissolved and plaintiffs have no further power or authority pursuant to that order. [¶] However, to the extent that this application [for clarification] is an attempt by defendant to re-interject this court into what is an exclusively religious controversy, the court declines to do so. No further 'orders' shall be rendered by this court as it has found that resort to the court to rule on what is a liturgical dispute is unconstitutional."

On June 15, 2012, the day after the court issued that minute order, Trimpi entered the ground floor of the St. Mary's premises and had a locksmith change the locks to that section. While there, Trimpi discovered that Bush and the others had barricaded themselves in on the second floor, chained the front gates, and installed padlocks and deadbolt locks on all exterior and interior doors. Bush and the others called the police. When the police arrived, Trimpi showed them the court's minute order. After reviewing the order, the police told Trimpi that they would take no action unless there was a court order to remove Bush and the others.

Six days later, the elected Vestry filed a lawsuit against Bush and the Kangs for forcible detainer (Los Angeles Superior Court case No. 12U07875, hereafter, the forcible detainer action). The following day, the elected Vestry filed another

9

lawsuit (Los Angeles Superior Court case No. BC487079, hereafter the ACA action) against the ACA, the DOW, Bush, and others, alleging causes of action for declaratory relief, conversion, intentional interference with business relations, trespass, breach of fiduciary duty, and injunctive relief.

In the ACA action, the elected Vestry alleged that St. Mary's corporate bylaws expressly provide for governance by a board of directors elected annually by St. Mary's members. It alleged that the ACA, the DOW, and certain individuals purporting to act on behalf of St. Mary's obtained a temporary restraining order and seized control of St. Mary's day-to-day operations, fabricated board resolutions, changed the signatories on all of St. Mary's bank accounts, and refused to relinquish or return the property they seized after the temporary restraining order was dissolved.

The initial action, the forcible detainer action, and the ACA action were deemed related within rule 3.300 of the California Rules of Court. All three cases were assigned to Judge Michael P. Linfield.

A few days after the forcible detainer and ACA actions were filed, Canon Morello sent letters to Trimpi, Gina Park, Jackie Yeager, and John Pouncey, telling each of them that he or she was removed from the Vestry. With regard to Trimpi and Park, Morello told them that he had received information that they had been and were currently co-habitating in an un-married relationship and therefore were ineligible to serve as members of the Vestry. He also informed them that they are denied Holy Communion. Morello told them that their removal from the Vestry was "effective as of April 9, 2012, when I became Priest-in-Charge of St. Mary's." With regard to Yeager, Morello stated that she was not eligible to serve as a member of the Vestry because she was the wife of a member of the clergy, and therefore she has been removed effective as of April 9, 2012. In his letter to Pouncey, Morello stated, "Due to your willful disobedience in refusing to turn over

10

minutes of the Vestry of St. Mary of the Angels while a Temporary Restraining Order was in place, you are hereby removed from your position on the Vestry."

E.  *Amendment of the Articles of Incorporation and Bylaws*

On July 30, 2012, the elected Vestry (including the four members Morello purported to remove) met and voted to submit proposed amended articles of incorporation and bylaws to all voting members of St. Mary's for a vote by written ballot on whether to adopt them. The proposed amended articles and bylaws stated that St. Mary's is no longer affiliated with the ACA, and that it is intended that the Parish will become a constituent part of the Roman Catholic Church. On July 31, 2012, the ballot and proposed amended articles and bylaws were sent or delivered to all qualified voting members of St. Mary's.[8] The ballot instructed the voters to sign and return the ballot by 12:30 p.m. on August 6, 2012.

A total of 59 ballots were sent or delivered. Forty executed ballots were returned within the allotted time. Thirty-one voted in favor of adopting the amended articles and bylaws, and nine voted against the adoption (i.e., 77.5 percent voted in favor). An additional six ballots were returned after the August 6 deadline; one voted in favor, and five voted against. If those votes are included with the timely votes, 69.5 percent voted to adopt the amendments. The amended articles of incorporation, signed by Trimpi as Executive Vice President and Pouncey as Secretary, were filed with the California Secretary of State on August 6, 2012.

---

[8]    Qualified voters were determined by reference to a list prepared in January 2012 (before the disputes at issue in these lawsuits arose), in accordance with the bylaws. (See discussion, *post*.) The list contained 65 names, but eight of the persons listed were not sent ballots because they had left the Parish, moved away, or were deceased. In addition, ballots were sent to two additional people who became voting members after the list was prepared.

F.      *Another Lawsuit is Filed*

The next day, August 7, 2012, the appointed Vestry filed another lawsuit, against Father Kelley, his wife, and his daughter, for unlawful detainer (Los Angeles Superior Court case No. 12U10148, hereafter the unlawful detainer action). The court ruled that this action was related to the other actions between the parties.

G.      *Trial is Held in the Forcible Detainer Action*

The first case to go forward was the forcible detainer action. By agreement of the parties and order of the trial court, trial was bifurcated, with the first phase addressing whether the issues raised in this case were ecclesiastical matters to which the court must defer to the highest ecclesiastical authority of the ACA and the DOW. The parties agreed that direct testimony for the first phase would be by written declaration.

The elected Vestry submitted declarations from, among others, all of its members elected on February 5, 2012, except Bush. The declarations described, among other things, the February 5 election and subsequent actions taken by the elected Vestry, including the August 6, 2012 vote to amend the articles of incorporation and bylaws to disaffiliate from the ACA. In addition, Trimpi declared that neither he nor the other members of the elected Vestry (1) retained the law firm of Lancaster & Anastasia (counsel for the ACA-related parties, who purport to represent St. Mary's); (2) selected Canon Morello to hold the position of Rector, Priest-in-Charge, or any other position at St. Mary's; (3) prescribed any other manner of selection of the Rector; or (4) approved the appointment of Bush as Senior Warden.

Bush and the Kangs submitted their own declarations, as well as declarations from The Rt. Rev. Bishop Brian R. Marsh (the President of the House of Bishops,

Bishop Ordinary of the Diocese of the Northeast, and Episcopal Visitor to the Diocese of the Eastern United States), Bishop Strawn, and Canon Morello. Bush declared that she has been a member of the Vestry since February 2012, and that she was appointed Senior Warden by Canon Morello on April 9, 2012. She explained that she is physically present on the St. Mary's premises on a daily basis, with the permission of Canon Morello, and described certain confrontations she has had with Father Kelley and several other individuals, including Trimpi. Diane Kang, who declared she was appointed to serve as secretary for the Parish by Canon Morello and is physically present on the premises on a daily basis, also described one of the incidents Bush described. Keith Kang, who also described that incident, stated that he served on the Vestry from January 2011 through February 2012, and subsequently was appointed to the Vestry by Canon Morello.

In his declaration, Bishop Marsh described the hierarchical structure of the ACA, the appointment of Bishop Strawn as Episcopal Visitor of the DOW (which he stated has jurisdiction over St. Mary's), the disciplining of Father Kelley, and his interactions with Father Kelley, including his attempts to get Father Kelley to vacate the premises. He also declared, "As the highest individual religious and ecclesiastical authority in the ACA, I certify that the current Rector and Priest-in-Charge of St. Mary's is The Rev. Canon Anthony J. Morello, Ph.D., and the Senior Warden of the St. Mary's Vestry is Marilyn Bush." Bishop Marsh attached a copy of the ACA Constitution and Canons to his declaration.

Bishop Strawn's declaration also described the hierarchical structure of the ACA and his disciplining of Father Kelley (which was ratified, adopted and confirmed by the House of Bishops). Bishop Strawn also stated that St. Mary's "remains under the ecclesiastical and canonical authority of the ACA and DOW," and that "the ACA and DOW recognize The Rev. Canon Anthony J. Morello,

13

Ph.D. as the *only* current and rightful Priest-in-Charge/Rector of [St. Mary's] and Marilyn Bush alone as the Senior Warden of the Vestry."

Canon Morello declared that he is the Rector and Priest-in-Charge of St. Mary's, that in accord with the bylaws, he is the President and CEO of the parish corporation, and that Bush and the Kangs act by his authority and permission. He stated that St. Mary's is an ACA parish within the ecclesiastical and canonical authority and jurisdiction of the ACA and the DOW, and attached as an exhibit to his declaration a copy of the DOW Canons. He explained that, as Rector, he removed Trimpi as Senior Warden and named Bush in his place, and that he removed Trimpi, Yeager, Pouncey, and Park from the Vestry effective as of April 9, 2012.[9] In addition, Canon Morello declared that Mike Merrill and Linda Hurley-Bruce are not members of the Vestry because they "w[ere] purportedly 'appointed' to the Vestry by Fr. Kelley after he had been Inhibited by Bishop Stephen D. Strawn and he was thus without authority to make such a purported appointment to the Vestry."[10]

---

[9] We note that Canon Morello's statement that he removed Pouncey from the Vestry effective as of April 9, 2012 is contrary to the letter he cites in support of his statement. That letter to Pouncey does not indicate that the removal was retroactive. In fact, the reason given for Pouncey's removal was that Pouncey refused to turn over the minutes of the Vestry while the temporary restraining order was in place, which was from May 25, 2012 to June 13, 2012.

[10] Although Merrill was not elected to the Vestry at the February 2012 annual meeting, he states that the Vestry elected him to an open seat on or about April 15, 2012, and that he accepted the position on or about May 5, 2012. In declarations filed earlier in the case (in opposition to a motion to quash), each member of the elected Vestry (other than Bush) stated that on or about April 9, 2012, the Vestry "acknowledged" that Bush had vacated both her membership in St. Mary's and her place on the elected Vestry by announcing that she was Senior Warden in another jurisdiction and by acting on behalf of that jurisdiction and against the elected Vestry. Each member stated that the elected Vestry elected Merrill to the seat vacated by Bush; they stated that they left vacant the seat vacated by Linda Bruce when she resigned.

14

In its trial brief, the elected Vestry argued that the ACA has no authority over St. Mary's because the Parish members voted, in an election conducted in accordance with St. Mary's bylaws and the California Corporations Code, to amend the articles of incorporation and bylaws to disaffiliate St. Mary's from the ACA. It also argued that even if St. Mary's had not amended its articles and bylaws, the court would not be required to defer to the ACA because the identity and authority of the elected Vestry does not require consideration or evaluation of religious doctrine. Instead, the procedures for electing the members of the Vestry and the Vestry's authority to control the Parish's property is set forth in St. Mary's bylaws, and there is no provision in those bylaws or in the ACA Constitution and Canons that allows the ACA to seize control of the corporation or change the composition of the Vestry.

Bush and the Kangs argued in their trial brief that the determination of who has the authority to control the Parish requires the identification of the rightful Rector "and through him the Vestry of St. Mary's," issues which they assert are ecclesiastical matters that the court cannot decide. They addressed the August 2012 vote to amend the articles and bylaws only in a footnote, arguing that the vote was "illegal" and violated the Parish's bylaws, and is "of no force and effect." They did not explain, however, how the vote violated the bylaws, and simply stated that the vote "will be the subject of further litigation."

The trial court issued its tentative decision on August 22, 2012. The court made many factual findings, including the following: (1) Jones, Pouncey, Hawkins, Trimpi, Bruce, Levin, Yeager, Park, and Bush were elected to the Vestry on February 5, 2012; (2) Bishop Strawn removed Father Kelley as Rector and appointed Canon Morello as Rector on April 2, 2012; (3) Canon Morello removed Trimpi as Senior Warden and removed Yeager, Pouncey, and Park from the Vestry, and appointed Marilyn Bush as Senior Warden on April 9, 2012; (4) Canon

15

Morello denied Holy Communion to certain parishioners on June 25, 2012; and (5) the Vestry elected on February 5, 2012 voted to approve amending the articles of incorporation and bylaws to state that St. Mary's is not affiliated with the ACA and sent written ballots to parishioners to approve the amendments, and that a large majority voted in favor of the amendment.

Addressing the legal issues, the trial court noted that "[t]he real issue in this case is not who *owns* St. Mary's Parish, but rather who *controls* St. Mary's Parish – i.e. who can determine what is done with St. Mary's property." The court went on to state that "[t]o answer this question, this court would have to determine who is the true Rector of St. Mary's Parish. This the court cannot do. The determination of who is the true Rector of St. Mary's Parish is a 'quintessentially religious controvers[y] whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of the Church.'" (Quoting *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (2012) 132 S.Ct. 694, 705 (*Hosanna-Tabor*).) Addressing the elected Vestry's argument that the Parish disaffiliated from the ACA by amending its articles of incorporation and bylaws, the court stated, "to determine whether this change in the Articles of Incorporation is valid, this court would have to determine which parishioners comprise the legitimate board of directors -- i.e., the Vestry -- of St. Mary's. This court would also have to determine which members of St. Mary's parish were '[c]ommun[i]cants in good standing' and thus entitled to vote under St. Mary's By-laws. This would require the court to determine, *inter alia*, if Bishop Strawn's April 2, 2012 Notice of Inhibition against Father Kelley, and Rev. Morello's April 9, 2012 replacement of Vestry members and later denial of Holy Communion to certain parishioners, were valid. And to do that, this court would have to determine what is the ecclesiastical and organizational significance of the termination of the Patrimony of the Primate." Thus, the court concluded that

16

"[t]his case is not simply one of property rights which the court can resolve using 'neutral principles of law,'" and that "[t]he determination of who is the true Rector of St. Mary's Parish, and who can control St. Mary's Parish property, rests 'exclusively [with] the highest ecclesiastical tribunals of the Church,'" to which the court must defer.

The court entered a final order of dismissal and judgment in favor of Bush and the Kangs on September 19, 2012.


H.      *Events After Judgment is Entered in the Forcible Detainer Action*

On the same day the trial court entered judgment in the forcible detainer action, the elected Vestry amended its complaint in the ACA action to add a claim for declaratory relief regarding the August 2012 amendments of the articles of incorporation and bylaws. It sought a judicial declaration that the articles and bylaws were officially amended on August 6, 2012 to state that St. Mary's is no longer affiliated with the ACA.

A week and a half later, the appointed Vestry moved for summary judgment against Father Kelley and his family in the unlawful detainer action. The trial court granted the motion on October 9, 2012. The court stated that the issues underlying the action -- who is the rightful clergy of St. Mary's, who are the rightful Vestrymen and Wardens, and who speaks on behalf of St. Mary's (in short, who controls St. Mary's) -- were litigated in the forcible detainer action. The court found that Father Kelley was collaterally estopped from re-litigating the issues, and it adopted the reasoning of its order dismissing the forcible detainer action. Judgment was entered in favor of the appointed Vestry on October 31, 2012.

On October 17, 2012, the ACA-related parties filed a demurrer to the elected Vestry's amended complaint in the ACA action. The trial court sustained the demurrer without leave to amend on December 4, 2012. Once again, the court

17

stated that the underlying issues in the ACA action are the same issues that were litigated in the forcible detainer and unlawful detainer action. The court noted, however, that the elected Vestry indicated it had filed a notice of appeal in the forcible detainer action. It concluded, therefore, that even though collateral estoppel would bar the elected Vestry from re-litigating these issues once there is a final judgment in the forcible detainer action, it would be premature to sustain the demurrer on collateral estoppel grounds. Nevertheless, the court adopted the reasoning of its orders and judgments in the forcible detainer and unlawful detainer actions and concluded that "resolution of this case would require this court to opine on a 'quintessentially religious controvers[y]' -- something that the court is forbidden to do by the First Amendment."

Judgment was entered in favor of the ACA-related parties on March 25, 2013.

I. *Appeals*

On October 19, 2012, the elected Vestry filed a notice of appeal to the Appellate Division of the Los Angeles Superior Court in the forcible detainer action. Father Kelley and his family filed a notice of appeal to the Appellate Division in the unlawful detainer action on November 8, 2012. The elected Vestry filed a notice of appeal (to this Court) in the ACA case on April 15, 2013; it was assigned case No. B248112.

On May 13, 2013, the elected Vestry, and Father Kelley and his family, each applied to the Appellate Division for transfer of their appeals to this court. The Appellate Division granted the applications on May 22, 2012. The forcible detainer appeal was assigned case No. B248929, and the unlawful detainer appeal was assigned case No. B248931.

18

On our own motion, we consolidated all three appeals for the purposes of oral argument and decision.

## DISCUSSION

A.    *Law Governing Resolution of Disputes Involving Religious Organizations*

We begin our discussion with an examination of *Episcopal Church Cases* (2009) 45 Cal.4th 467, in which the California Supreme Court addressed the issues that arise when a secular court is asked to resolve a church property ownership dispute.  Although the cases before us do not involve a dispute over the ownership of St. Mary's property -- all parties (and the trial court) agree that the property is owned by St. Mary's, i.e., the corporation -- but rather a dispute over who controls the corporation, the same reasoning that applies to resolution of a church property dispute applies to resolution of a dispute over governance of a religious corporation.  (*Classis of Central California v. Miraloma Community Church* (2009) 177 Cal.App.4th 750, 759-760 (*Miraloma*); *Iglesia Evangelica Latina, Inc. v. Southern Pacific Latin American Dist. of the Assemblies of God* (2009) 173 Cal.App.4th 420 (*Iglesia Evangelica*); *Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1412-1413 (*Concord Christian*).)

The Supreme Court instructed in *Episcopal Church Cases* that "when asked to do so, secular courts may, indeed must, resolve internal church disputes over ownership of church property.  As the [United States Supreme Court] put it in the seminal 19th-century case involving a church property dispute, 'an appeal is made to the secular authority; the courts when so called on must perform their functions as in other cases.  [¶]  Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and

19

the actions of their members subject to its restraints.' (*Watson v. Jones* (1871) 80 U.S. 679, 714.) Similarly, in its most recent decision involving a church property dispute, the court stated, 'There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.' (*Jones v. Wolf* [(1979)] 443 U.S. [595,] 602.)" (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 478.)

Our Supreme Court warned, however, that "when called on to resolve church property disputes, secular courts must not entangle themselves in disputes over church doctrine or infringe on the right to free exercise of religion. In this regard, the United States Supreme Court has made two points clear: (1) how state courts resolve church property disputes is a matter of state law; but (2) the method a state chooses must not violate the First Amendment to the United States Constitution. '[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.]'" (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 478-479, quoting *Jones v. Wolf*, *supra*, 443 U.S. at p. 602, fn. omitted.)

As our Supreme Court noted, the United States Supreme Court "has approved two methods for adjudicating church property disputes" -- the "principle of government" approach, which was adopted in *Watson v. Jones*, *supra*, 80 U.S. 679, and the "neutral principles of law" approach described in *Jones v. Wolf*, *supra*, 443 U.S. 597. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 480.) Under the principle of government approach, if the church at issue is a hierarchical

church, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson v. Jones*, *supra*, 80 U.S. at p. 727.)  Under the neutral principles of law approach, the court examines the organizations' governing documents, title documents, and the like, and applies "'neutral principles of law, developed for use in all property disputes.'"  (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 480.)

In approving the neutral principles of law approach, the United States Supreme Court recognized its potential difficulties, since it requires civil courts to examine certain religious documents that may incorporate religious concepts in the provisions related to the ownership of property.  But the court concluded that "the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application.  These problems, in addition, should be gradually eliminated as recognition is given to the obligation of 'States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.'"  (*Jones v. Wolf*, *supra*, 443 U.S. at p. 604, quoting *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449.)

After reviewing the advantages and disadvantages of the two approaches, our Supreme Court concluded that California courts should use the neutral principles of law approach.  The Supreme Court instructed that "secular courts called on to resolve church property disputes should proceed as follows:  State courts must not decide questions of religious doctrine; those are for the church to resolve.  Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority

21

that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 485.)

Applying the Supreme Court's directive in the context of disputes over control of local church corporations in hierarchical churches, California appellate courts have examined the governing documents (such as articles of incorporation and bylaws) of both the local and general churches and State statutes, and applied neutral principles of law to determine whether the disputed exercise of control over the local corporation complied with the governing documents and State law.

For example, in *Concord Christian*, *supra*, 132 Cal.App.4th 1396, a local church and its pastor attempted to disaffiliate from its national church, and challenged the national church's removal of the pastor and imposition of supervision and control over the local church and its assets. As to the issue whether the national church's removal of the pastor was proper, the appellate court held that the trial court properly applied the ecclesiastical rule of judicial deference. (*Id.* at p. 1413.) But with regard to the national church's imposition of supervision and control over the local church and its assets, the appellate court held that the trial court properly examined the parties' governing documents and the factual circumstances to determine whether the local church's attempted withdrawal from the national church was effective and whether the national church properly imposed supervision and control over the local church. (*Id.* at pp. 1413-1416.) The appellate court affirmed the trial court's findings that (1) the local church's attempt to disaffiliate from the national church was ineffective because

the local church failed to comply with a provision of the national church's bylaws, which applied to the local church under the local church's articles of incorporation (*id.* at pp. 1414-1415); (2) the national church's imposition of supervision was justified under the bylaws (*id.* at p. 1415); and (3) by virtue of its proper imposition of supervision, the regional board of the national church had legally become the local church's board of directors, with control and direction over all the local church's property and assets (*id.* at pp. 1415-1416).

Similarly, in *Miraloma*, *supra*, 177 Cal.App.4th 750, the trial court examined the governing documents of the local and national churches to determine if the local church's attempt to disaffiliate from the national church, after the national church voted to supersede the governing body of the local church, was effective. In that case, the national church required its local churches to include in their articles of incorporation a provision stating that the local church is subject to and governed by the national church's constitution, and that the local church agrees that that provision "'shall not be amended or modified in any manner without the prior written consent of the classis[11] of which [the local church] is a member.'" (*Id.* at p. 755, fn. 2.) The bylaws of the local church at issue in that case included such a provision. (*Id.* at p. 756.) The constitution of the national church provided that a local church cannot sell, transfer, or encumber real property without the approval of the classis, and set forth procedures by which a local church can petition to withdraw from the national church. (*Id.* at p. 755.) The constitution also provided that a classis had the power, in its judgment, to supersede the governing body of a local church and replace it with an administrative body

---

[11] A classis is a regional governing unit comprising all the enrolled ministers within its bounds and elder delegates representing the churches within its bounds. (*Miraloma*, *supra*, 177 Cal.App.4th at p. 754, & fn. 1.)

23

designated by the classis, and set forth detailed procedures for accomplishing that process. (*Id.* at p. 757.)

The appellate court affirmed the trial court's findings that the local church's attempt to disaffiliate was ineffective because it violated its own bylaws and the constitution of the national church. (*Miraloma*, *supra*, 177 Cal.App.4th at pp. 762-766.) The appellate court also examined whether the national church's superseding of the governing body of the local church was valid. The court first noted that that the classis' decision to institute the supersedure process and its vote to supersede were ecclesiastical judgments to which courts must defer. (*Id.* at p. 767.) It then examined the procedure the national church followed, and concluded that it followed the dictates of the constitution, and that the procedure did not violate California's Corporations Code. (*Id.* at pp. 767-768.)

Finally, in *Iglesia Evangelica*, *supra*, 173 Cal.App.4th 420, a local church challenged its corporate takeover by the regional district of the national church and the regional district's transfer of the local church's property to the regional district. The trial court ruled that it could not interfere with the regional district's decisions because the national church was a hierarchical church and the local church agreed to be governed by the national church's and the regional district's constitution and bylaws, which gave the regional district the absolute authority to resolve disputes. (*Id.* at pp. 431-432.) In reversing the trial court, the appellate court explained, "The rule of deference to ecclesiastical decisions . . . does not require us to ignore [the local church's] secular corporate form. Because we can resolve the issue of whether [the regional district's] corporate takeover of [the local church] was proper without reference to . . . church doctrine, we apply neutral principles of law to this dispute." (*Id.* at p. 440.)

The appellate court examined the local church's bylaws, as well as California's Corporations Code, and observed that there was no evidence that the

24

regional district complied with those provisions in conducting its corporate takeover of the local church. (*Iglesia Evangelica*, *supra*, 173 Cal.App.4th at p. 441.) It also examined the governing documents of the national church and the regional district, and concluded those provisions were insufficient to permit the regional district to ignore the local church's corporate form.[12] (*Ibid.*) The court also found there were no provisions in those governing documents that allowed the regional district to supplant the local church's ownership of its property and that the regional district did not comply with the express provisions of its own bylaws governing transfers of property. (*Id.* at pp. 443-444.)

What these cases teach us is that, while courts must avoid deciding questions of religious doctrine when presented with disputes between a local church and a national church, courts have a duty to examine the governing documents of the local and national churches to determine whether the dispute at issue may be resolved without reference to religious doctrine, and can instead be resolved by application of neutral principles of law.

B.      *Governing Documents*

The governing documents relevant to the issues before us are St. Mary's articles of incorporation and bylaws in effect at the time the dispute began, and the ACA Constitution and Canons.

---

[12]      The court noted that this lack of specific provisions allowing the regional district to ignore the local church's corporate form distinguished the case from *Concord Christian*, *supra*, 132 Cal.App.4th 1396, because the bylaws at issue in *Concord Christian* contained specific provisions allowing the regional board of directors for the national church to take control of a local church under the circumstances present in that case. (*Iglesia Evangelica*, *supra*, 173 Cal.App.4th at p. 441.)

1.   *St. Mary's Articles of Incorporation* (*as of January 2012*)

At the time this dispute began, St. Mary's articles of incorporation stated that St. Mary's was incorporated as a religious corporation under the laws of California, and that the purpose for which the corporation was formed is:  (1) "[t]o establish and maintain a Parish, which shall form a constituent part of the One, Holy, Catholic and Apostolic Church as that Church has been known in the Anglican Catholic tradition"; and (2) to hold property, transact all business relative thereto, and to exercise any and all powers and privileges permitted or granted by the laws of California to religious organizations.  The articles also stated that the corporation's property is irrevocably dedicated to religious, charitable, scientific, or hospital purposes.  (St. Mary's Articles of Incorporation, Art. II.)

2.   *St. Mary's Bylaws* (*as of January 2012*)

a.   Affiliation

At the time this dispute began, St. Mary's bylaws stated that the Parish is affiliated with the ACA and its Diocese of the West,[13] and that "[t]he Constitution and Canons of the Anglican Church in America shall take precedence over these by-laws except as relates to the ownership of real and personal property of the Church."  (St. Mary's Bylaws, Art. I, §§ 1, 2.)

b.   Membership

The bylaws set forth the qualifications to be a voting member of the corporation.  Members must be (1) communicants in good standing (which is defined as members in good standing who have been confirmed or received into the Church by a Bishop, who worship regularly each week, and have received Holy

---

[13]    But see footnote 2.

26

Communion at least at Easter-tide, Whitsuntide, and Christmastide during the last preceding year); (2) 18 years of age or older; and (3) "[r]egistered in the Parish Register as a Communicant of the Parish and upon the books of the Treasurer as a pledged, or regular weekly or monthly contributor to the support of the general budget of the Parish, or a giver of notable service acknowledged by the Rector and Vestry, for at least the preceding twelve months." (St. Mary's Bylaws, Art. III, §§ 2, 3.1.)

The Treasurer is required to furnish the Rector with a list of the people who meet the financial requirements, on January 1 and July 1 of every year. (St. Mary's Bylaws, Art. III, § 3.1(c).) The Rector must then submit to the Vestry at its January and July meetings the names of the qualified voting members of the corporation, and those names must be recorded in the minutes of the Vestry for those meetings. (St. Mary's Bylaws, Art. III, § 3.2.)

### c.      Meetings and Voting

The bylaws require the Parish to hold an annual meeting each year in January or the first Sunday in February, for the election of the Vestry and the transaction of other business. Special meetings may be called at any time by the Vestry, or the Rector with the concurrence of the Vestry, or by written petition of 30 percent or more of the voting members filed with the Vestry. The bylaws include provisions detailing how notice of the annual or special meeting must be given. (St. Mary's Bylaws, Art. IV, §§ 2, 3.)

With regard to voting, the bylaws specify that "eligibility of voters [is] established by reference to the voting membership list." (St. Mary's Bylaws, Art. IV, § 4.) A majority of members present and voting at a meeting at which there is a quorum is required for official action, unless otherwise specified in the bylaws or by law. (St. Mary's Bylaws, Art. IV, § 4.) A majority of the voting members (as

27

determined by the qualified voting members list) constitutes a quorum for any meeting of the members. (St. Mary's Bylaws, Art. IV, § 5.)

### d. Rector

The Rector is the president of the corporation, and has "final responsibility for the spiritual and ecclesiastical activities of this church." All facilities of the church "necessary for carrying out his pastoral functions" are under his control. (St. Mary's Bylaws, Art. V, § 1.1.) He is chosen in accordance with Canon 44, sections 1 through 6 of the ACA Constitution and Canons. (St. Mary's Bylaws, Art. VII, § 4.2.) If there is a vacancy in the office of the Rector, Article V, section 2 of the bylaws provide that the vacancy "shall be filled in a manner prescribed by the Vestry in conjunction with the ecclesiastical jurisdiction that exercises episcopal oversight of the Parish, provided the Constitution or Canons of that jurisdiction do not abrogate or deny the right of the Vestry to make the selection." (St. Mary's Bylaws, Art. V, § 2.) The bylaws reiterate in Article VII, section 3 that "[t]he Rector may be removed, and vacancies in the office of Rector may be filled only in accordance with Article V." (St. Mary's Bylaws, Art. VII, § 3.)

### e. Vestry

The Vestry is the board of directors for the corporation, and is responsible "for all matters pertaining to the temporal activities and physical survival" of the church. (St. Mary's Bylaws, Art. VI, § 1.1.) The Rector is a member of the Vestry, *ex officio*, and normative chairman, who may vote only in the case of a tie. (St. Mary's Bylaws, Art. VI, § 1.1.) There are nine elected members of the Vestry, who are elected by voting members of the Parish at the annual meeting. Any pledging member of the Parish is eligible to be elected to the Vestry. (St. Mary's Bylaws, Art. VI, §§ 1.1, 2.)

The term of office is three years, commencing immediately upon his or her election and terminating upon the election and qualification of his or her successor. (St. Mary's Bylaws, Art. VI, § 3.) There is only one provision for termination of an elected Vestry member before his or term has expired. If a member of the Vestry fails to attend three consecutive regular meetings, the position can be declared vacant by the fourth Vestry meeting. (St. Mary's Bylaws, Art. VI, § 8.) If a vacancy occurs between annual meetings of the Parish, the members of the Vestry then serving may fill the vacancy by electing a qualified member of the Parish; in the event of a tie vote, the Rector votes to break the tie. (St. Mary's Bylaws, Art. VI, § 4.)

The officers of the Vestry are the Rector, the Senior Warden, the Junior Warden, the Clerk/Secretary, and the Treasurer. (St. Mary's Bylaws, Art. VII, § 1.)

The Rector is the president and chief executive officer of the corporation, and is "subject to such control as the Vestry may have under the Corporations Code." The Vestry may not, however, interfere with the Rector's pastoral responsibilities. (St. Mary's Bylaws, Art. VII, §§ 1, 4.1.)

The Senior Warden is the executive vice president of the corporation. (St. Mary's Bylaws, Art. VII, §§ 1, 5.) He or she is appointed by the Rector from among the members of the Vestry, with their approval, and can be removed only by the Rector. (St. Mary's Bylaws, Art. VII, §§ 2, 3.) He or she performs the administrative duties of the Rector in the Rector's absence, and when so acting, has all the secular powers of, and is subject to all the restrictions upon, the Rector. (St. Mary's Bylaws, Art. VII, § 5.)

The Junior Warden is the second vice president, and is elected by the Vestry members. (St. Mary's Bylaws, Art. VII, §§ 1, 2.) He or she is charged with the care of the physical plant, i.e., the Church property, buildings, and grounds. In the

29

absence of the Rector and Senior Warden, he or she presides over meetings of the Vestry. (St. Mary's Bylaws, Art. VII, § 6.)

The Treasurer of the corporation is elected annually by the Vestry from among the voting members of the Parish. (St. Mary's Bylaws, Art. VII, § 7.) In addition to compiling a list of qualified voting members of the Parish twice a year (St. Mary's Bylaws, Art. III, § 3.1), he or she must present detailed financial reports, keep and maintain accurate accounts of the properties and business transactions of the corporation, and disburse funds of the corporation as directed by the Vestry. (St. Mary's Bylaws, Art. VII, § 7.)

The Clerk/Secretary is elected by the Vestry members. (St. Mary's Bylaws, Art. VII, § 2.) He or she is required to keep a book of minutes at the principal office of the corporation, and to give notice of meetings of the Vestry or of the meetings of the membership of the Parish when written notice is required. (St. Mary's Bylaws, Art. VII, § 8.)

### f. Other Provisions

The bylaws also contain the following provisions relevant to the issues in this case.

First, the bylaws state that "in temporal and secular matters, as distinct from matters which are ecclesiastical, the Civil Law of the State of California and particularly the Non-profit Corporation Law, as contained in the Corporations Code, is and shall be binding upon this Corporation." (St. Mary's Bylaws, Art. IX, § 1.)

Second, the bylaws provide that "[n]o person shall . . . enter into any contract in the name of the Parish without written authorization of the Vestry." (St. Mary's Bylaws, Art. VII, § 9.)

Third, the bylaws state that "[t]he use of the Altars and the church building, with all appurtenances necessary for the conduct of worship, is deemed to be an ecclesiastical matter, and is under the jurisdiction of the Rector." (St. Mary's Bylaws, Art. IX, § 2.)

Fourth, the bylaws provide, "Notwithstanding the Affiliation of this Parish, as provided in Article I above, the Title to all real and personal property now held by the Corporation or acquired in the future by this Corporation, shall and does remain with the Corporation, *to wit*, with St. Mary of the Angels Parish." (St. Mary's Bylaws, Art. IX, § 3.)

Finally, the bylaws state that the bylaws may be altered or amended at any lawful meeting of the members of the Parish by an affirmative vote of not less than two-thirds of those present and voting, or by any other method provided for in the California Corporations Code. If the alteration or amendment is by written consent, rather than a vote at a meeting, the written consent must include the signature of all members voting in favor of the change. Any alteration or amendment may not be inconsistent with the Parish's articles of incorporation. (St. Mary's Bylaws, Art. XII.)

### 3.     *Constitution and Canons of the ACA*

The only provisions of the ACA Constitution and Canons that appear to have any relevance to the issues in the present appeals are canon 12, related to parish vestries, and canon 44, related to the filling of vacant Cures.

Canon 12 provides that "[i]n every Parish of this Church the number, mode of election, and term of office of Wardens and Vestrymen, with the qualification of voters, shall be such as the State or Diocesan Law may permit or require, and the Wardens and Vestrymen elected under such law shall hold office until their

31

successors are elected and have qualified."[14]  (ACA Const. & Can., can. 12, § 12.1.)  It also provides that, "[e]xcept as provided by the law of the State or of the Diocese, the Vestry shall be agents and legal representatives of the Parish in all matters concerning its corporate property and the relations of the Parish to its Clergy."  (ACA Const. & Can., can. 12, § 12.2.)

Canon 44 leaves the ultimate selection of a Rector to the Parish, although it requires consultation between the Bishop and the Vestry and approval by the Bishop, and it may allow the Bishop to appoint a temporary Rector.

Before the Parish may elect a Rector, the Parish must submit the name of the proposed Rector to the Bishop, and give the Bishop at least 30 days to communicate with the Vestry regarding the proposed candidate.  The Bishop's communication, if made within that time period, must be considered by the Parish or the Vestry at a meeting called and held for that purpose.  (ACA Const. & Can., can. 44, § 44.2.)  Once the election is held, the wardens of the Parish must give written notice to the ecclesiastical authority of the Diocese.  If the ecclesiastical authority is satisfied that the elected Rector is a duly qualified Minister and has accepted the office, and that he was approved by the Diocesan Bishop, the notice will be sent to the Secretary of the Synod, who will record it.  (ACA Const. & Can., can. 44, § 44.3.)

Canon 44 also requires the Parish wardens or other officers to notify the Bishop if there is a vacancy in the office of the Rector.  If the authorities fail to make provision for the services within 30 days, "it shall be the duty of the Bishop to take such measures as he may deem expedient for the temporary maintenance of Divine services therein."  (ACA Const. & Can., can. 44, § 44.1.)

---

[14]	There is no indication in the record that the ACA contends that the provisions of St. Mary's bylaws relating to these items is contrary to the law of California or the DOW.

C.  *Determination of the Issues Regarding Who Controls St. Mary's*

In concluding that it could not resolve the issue of who controls St. Mary's, the trial court stated it would be required to determine who is the true Rector.  And, to determine the validity of the amendment of St. Mary's articles of incorporation, the court stated that it would have to determine who were the legitimate members of the Vestry and who were communicants in good standing entitled to vote, which would require the court to determine whether Bishop Strawn's notice of Inhibition against Father Kelley and Canon Morello's replacement of Vestry members and denial of Holy Communion were valid, which, in turn, would require the court to determine the ecclesiastical and organizational significance of the termination of the Patrimony of the Primate.  All of these issues, the court concluded, were ecclesiastical matters, the determination of which rests exclusively with the highest ecclesiastical tribunal of the ACA.  We conclude that most of the determinations the trial court found were required are not, in fact, necessary to determine who controls St. Mary's, and the matters that must be resolved can be determined through the application of neutral principles of law.

1.  *Who is the Rector?*

There is no question that the validity of the ACA's removal of Father Kelley as Rector of St. Mary's is a "'quintessentially religious controvers[y] whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals' of the Church." (*Hosanna-Tabor*, *supra*, 132 S.Ct. at p. 705.)  What is less certain is whether Bishop Strawn's appointment of Canon Morello as Rector of St. Mary's was valid.

St. Mary's bylaws and the ACA's canons make clear that the selection of the Rector is reserved to the Vestry, albeit after consultation with the Bishop.  (St.

33

Mary's Bylaws, Art. V, § 2; St. Mary's Bylaws, Art. VII, § 3; ACA Const. & Can., can. 44, § 44.2.) But ACA canon 44, which St. Mary's bylaws expressly adopts, authorizes the Bishop "to take such measures as he may deem expedient" to ensure that church services are provided if the Parish has not made provision for services. (ACA Const. & Can., can. 44, § 44.1.) Appointment of a Rector may qualify as such a measure, although we note that the canon seems to authorize at most only a temporary appointment, particularly in light of the provision in St. Mary's bylaws that the ACA Constitution and Canons cannot "abrogate or deny the right of the Vestry to make the selection" of a Rector. (St. Mary's Bylaws, Art. V, § 2.)

But we need not decide whether the ACA acted properly in appointing Canon Morello, because if the August 2012 amendment of St. Mary's articles of incorporation and bylaws was valid, the validity of Canon Morello's appointment is irrelevant, since by that amendment (if valid), St. Mary's disaffiliated from the ACA. Determination of the validity of the amendment does not require a determination of the validity of Canon Morello's appointment because he would not have been entitled to vote when the Vestry approved the amendment since, under the bylaws, the Rector can vote only in the case of a tie. (St. Mary's Bylaws, Art. VI, § 1.1.)

2.     *Who Are the Members of the Vestry?*

Although the determination of the members of the Vestry may involve ecclesiastical issues as to two of the members, there are no such issues regarding the remaining members. As noted, following the election held in accordance with St. Mary's bylaws at the February 2012 annual meeting of the Parish, the Vestry consisted of Hawkins, Jones, Pouncey, Trimpi, Bruce, Levin, Yeager, Bush, and Park. The validity of that election has not been challenged. In June 2012, Canon Morello purported to remove four members of the Vestry – Trimpi, Park, Yeager,

34

and Pouncey. Even assuming Canon Morello's appointment as Rector was valid, the Rector does not have the authority to remove members of the Vestry under the bylaws.[15] The ACA-related parties argue, however, that the bylaws do not limit the Rector's authority, because the bylaws provide that the ACA Constitution and Canons take precedence over the bylaws. But the ACA-related parties do not cite to any provision of the Constitution and Canons that gives the Rector the authority to remove members of the Vestry, and we have found none in our review of that document.

We note, however, that Canon Morello denied Holy Communion to Trimpi and Park in his June 25, 2012 letters to them. Thus, Trimpi and Park may have been rendered not qualified to be members of the Parish, because they would not be "communicant[s] in good standing" as required in the bylaws, and therefore they no longer would be qualified to be members of the Vestry. (St. Mary's Bylaws, Art. III, § 3; but see Corp. Code, § 9221, subd. (b) ["Unless otherwise provided by the articles or bylaws, *the board, by a majority vote* of the directors who meet all of the required qualifications to be a director, *may declare vacant the office of any director who fails or ceases to meet any required qualification* that was in effect at the beginning of that director's current term of office"], italics added.)

Assuming that Trimpi and Park no longer were qualified to be members of the Vestry, the identification of the remaining members at the time of the vote to amend the articles of incorporation and bylaws does not require resolution of any

---

**15** Moreover, the reason given for removing Yeager – that she was not eligible to serve because she was the wife of a member of the clergy – is contrary to the bylaws, which states that any pledging member of the Parish is eligible to be elected to the Vestry. (St. Mary's Bylaws, Art. VI, § 2.)

35

ecclesiastical matters.[16] Members of the Vestry can only be elected – by the Parish members at an annual meeting, or by the Vestry itself if there is a vacancy between annual meetings. (St. Mary's Bylaws, Art. VI, §§ 2, 4.) There is no provision in the bylaws, or in the ACA Constitution and Canons that allows the Rector to appoint members to the Vestry. Thus, to the extent Canon Morello purported to appoint anyone to the Vestry, that appointment was invalid. Accordingly, at the time of the vote to amend the articles and bylaws, the remaining members of the Vestry were Hawkins, Jones, Pouncey, Levin, Yeager, and Bush, and possibly Merrill.[17]

3.      *Who is Qualified to Vote?*

The determination of who is qualified to vote on the amendments to the articles of incorporation and bylaws may, at first glance, appear to be an ecclesiastical matter, because under the bylaws, voting members must be "communicant[s] in good standing." (St. Mary's Bylaws, Art. III, § 3.1(a).) But the bylaws provide a procedure that allows a court to determine the validity of a

---

[16]     To the extent the ACA-related parties assert that, in December 2012, Bishop Strawn declared several other members were excommunicated retroactively to April 2012, that act is not properly before us because it occurred after judgment had been entered in two of the three cases on appeal, and after the demurrer had been sustained in the third case. Moreover, if it is found that the August 2012 amendment to St. Mary's articles of incorporation and bylaws was valid, any action taken by Bishop Strawn or any other ACA-related party after that amendment is irrelevant as St. Mary's would no longer be affiliated with the ACA.

[17]     As noted in footnote 10, *ante*, the members of the Vestry declared Bush's seat on the Vestry vacant when she announced she was Senior Warden under Canon Morello and acted against the interest of the Vestry, and elected Merrill to fill that seat. There is no provision in the bylaws allowing such an action against Bush. Because there was another vacant seat on the Vestry as a result of Bruce's resignation shortly after the election, it is unclear whether Merrill's election by the Vestry was valid.

vote taken by the members without requiring the court to resolve any ecclesiastical issue.

The bylaws require the Treasurer to compile a list of all persons who meet the financial requirements to be a voting member and provide it to the Rector on January 1 and July 1 of every year. (St. Mary's Bylaws, Art. III, § 3.1(c).) The Rector makes the ecclesiastical determination of who is a "communicant in good standing" and submits to the Vestry at its January meeting and its July meeting the list of names of the people who qualify as voting members. (St. Mary's Bylaws, Art. III, § 3.2.) When there is any vote, the bylaws state that "eligibility of voters [is] established by reference to the voting membership list." (St. Mary's Bylaws, Art. IV, § 4.)

The ACA-related parties argue that notwithstanding the express procedure set forth in the bylaws for creating the list twice a year and requiring eligibility determinations to be made by reference to the voting membership list, there still must be a determination made, at the time of any vote, as to whether each voter was a communicant in good standing. In other words, they contend the voting membership list is ever-fluid. We disagree, because their contention ignores the clear language of the bylaws.[18]

By structuring the determination of eligible voters the way the bylaws did, it appears that they were drafted to avoid problems that could arise if a vote is challenged on the ground of voter eligibility. Indeed, these are precisely the kind of provisions the United States Supreme Court instructed religious organizations to

---

[18]    We note that the bylaws do not expressly preclude amendments to the voting membership list after the list has been submitted to the Vestry and recorded in the minutes, but the bylaws appear to require that any amendments made by the Rector be submitted to the Vestry and recorded in the minutes. Thus, when conducting a vote, the eligibility of voters would be determined by referring to the list, which includes any amendments recorded prior to the vote.

include "so as not to require the civil courts to resolve ecclesiastical questions." (*Presbyterian Church v. Hull Church, supra,* 393 U.S. at p. 449 [the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions'"]; accord, *Jones v. Wolf*, *supra*, 443 U.S. at p. 604 [problems in applying neutral principles of law approach "should be gradually eliminated as recognition is given to the obligation of 'States, religious organizations, and individuals [to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions'"].)

In this case, the elected Vestry presented evidence that ballots to vote on the amendment to the articles of incorporation and bylaws were sent to all qualified voting members as determined by reference to the January 2012 voting members list – the last list that was prepared and submitted to the Vestry. We note, however, that ballots were not sent to eight people who were listed, and were sent to two people who were not on the list. On remand, the trial court must determine whether those omissions and additions affected the validity of the vote. In other words, the court must determine if there was official acknowledgement of or action taken, recorded in the minutes of the Vestry, to remove or add those names on the list of qualified voters. To the extent there was no official acknowledgement of or action taken as to one or more of the persons omitted (other than the deceased parishioner), the court must determine whether the vote in favor of the amendment would have passed with the requisite two-thirds majority if those persons had voted against the amendment. If there was no official acknowledgement of or

38

action taken as to the persons added, those votes may not be counted regardless of how they voted.[19]

D.    *Remand to the Trial Court is Necessary*

The dispositive issue in all three cases before us – who controls St. Mary's? – comes down to the validity of the August 2012 amendment to the articles of incorporation and bylaws.  If the amendment was valid, then St. Mary's no longer is affiliated with the ACA, and any acts by the ACA after August 6, 2012 are irrelevant.  If the amendment was not valid, then, under the provisions of the bylaws, the Rector has jurisdiction over the church building, and the ACA's post-August 6, 2012 acts have force and effect.

Although we have concluded that the validity of the August 2012 amendment may be determined through application of neutral principles of law, we cannot, as the elected Vestry argues in its briefs on appeal, order entry of judgments in its favor based upon the trial court's factual findings in the forcible detainer action.  Trial in that action was bifurcated, and the first phase addressed only whether the issues raised were ecclesiastical matters to which the court must defer to the highest ecclesiastical authority of the ACA and the DOW.  The validity of the August 2012 amendment was not at issue in that phase, and therefore, Bush and the Kangs were not obligated to (and did not) present any evidence as to that issue.  Instead, Bush and Kangs simply asserted that the vote to amend was "illegal" and violated the Parish's bylaws.  Therefore, even if the trial court made findings of fact that could support a finding that the amendment was valid, judgments could not be entered in favor of the elected Vestry without giving the

---

[19]    Once again, we note that, to the extent the ACA-related parties assert that Bishop Strawn excommunicated anyone on the list of qualified voters in December 2012, that act is not properly before us and is in any event irrelevant if the vote in August 2012 is found to be valid.  (See fn. 16, *ante*.)

39

ACA-related parties an opportunity to present evidence to support their assertion that the vote on the amendment was "illegal." Accordingly, we reverse the judgments in all three cases before us and remand to the trial court for further proceedings to allow both sides to present evidence on the validity of the August 2012 amendment.

## DISPOSITION

The judgments are reversed and the matters are remanded for further proceedings to allow the parties to present evidence on, and for the court to determine, the validity of the August 2012 vote to amend St. Mary's articles of incorporation and bylaws. Appellants shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.                    EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.